Good morning. Will the attorneys who are going to argue this morning approach the podium. Identify yourselves and the party you represent and indicate to the court how much time you want to argue. Thank you, Your Honor. Michael Winn, Jones Day on behalf of the appellant, Midwest Palliative Hospice and Care Center. 20 minutes initially and then 10 for rebuttal. Keep in mind this microphone is for recording purposes only. If you want to be heard you have to speak up loudly. Carl Elitz, Assistant Attorney General, Your Honor for the Department of Revenue. 20 minutes as well. Very well. Mr. Winn. Thank you, Your Honor. I'm here on behalf of the appellant, Midwest Palliative Care Center on an administrative review of a partial denial of a decision for a charitable property tax exemption. The property at issue involved here has two buildings on it, one of which I'll refer to as a care center, the other one I'll refer to as a hospice. The care center is exempt by decision of the department and I will get into that later. Can you speak up just a little bit? Yes, the hospice is not exempt and that's the decision that's before you why that was denied. Why is the exemption before us? I'm sorry? Why is the piece that is exempt before us? The piece that is exempt is part of the same application by the same applicant and it was not before you because the department didn't make a decision, the ALJ did not make a decision about that. The department stipulated to the exemption for that building and we introduced the suggestion at the beginning of the hearing and we advised the ALJ on the record that not only was that exempt but we were presenting evidence only about use for the second building. The department had exempted the care center for the 2008 year and then stipulated for the 2013 application, which is before you, that that building continued in exempt ownership and exempt use. So exempt ownership meant... So the reapplication for 2013 was for the entire property. That is correct. The department stipulated that 92% of the building was exempt, the other 8% essentially for the hospice care. No, Your Honor. The department stipulated that the care center building, which it exempted in 2008 and again in 2013, was 91.9% exempt and that included the parking spaces around the building. And the 8% that was not exempt was for administrative offices in that building. In 2013, the hospice building was up for review the first time. It was not on that plot in 2008. The exemption that previously existed had been carried forward. That is correct. The application was only for the hospice center. The application was for both buildings because we had an exemption for 2008. Before that had been decided, we had to file the application for 2013. In 2013, the department decided the 2008 case and agreed to exempt the first building, the care center. And so we went to hearing on the second application. And by that time, the department said, well, having already made the decision for 2008 and having verified that our application showed it was in its exempt ownership and exempt use as it was in 2008, they agreed to exempt that building and to have the hearing be only about the exclusively charitable use of the second building, the hospice, which was constructed in 2012. Now, that's connected, though, right? It is connected. It's adjacent to. And they're just one thing, right? That's correct. They're the same plot of land. They're covered by the same application. They were owned by the same legal entity subject to the same articles of incorporation, the same bylaws, the same charitable care policy, everything, the same financials. They are owned by the same entity that the department determined was a charitable organization. But as to the original building, there was a stipulation, correct? For 2013, there was, correct. And not for the hospice building center. That is correct. Okay. So the only issue before us is the hospice center. Right. And the only issue that should be before you is the exclusive use of the hospice center. We take issue with the department's decision, and I'll put it on campus, but because we stipulated the exclusive use was the only issue before him, he then applied the entirety of the six causing factors, the methods of people's homes versus courting, five of which relate to ownership. And he applied them in the way of determining the use, when in fact the only causing requirement that was before him was exclusive use, which is a constitutional requirement. All Corson does is clarify that exclusive means primary, not secondary, not incidental. Exclusive charitable use. Charitable use, correct. So again, in context, Midwest is the organization that does this. Let me give you some context for what they do. Okay, but let me just, there was the stipulation that was entered into September 1st of 2016. Okay. This settlement agreement, is this what you're referring to as affecting the 2013 taxes for the care center? The settlement agreement was on a 2008 application. Yes. It determined the 91.9 percent. Yes. Then there was a stipulation, stipulation number one, for facility exemption, which said that that settlement agreement was being carried forward into 2013 because the same charitable ownership and same charitable use of that building was established for 2013. Okay. So the second stipulation that was introduced was we got to the entire application, all the documents. So the ALJ had before him, these two stipulations, every single document the department relied on to reach that stipulation and to confirm he had exempt ownership and exempt use, as well as the testimony that was presented at the hearing. But you believe that it was error for the ALJ to look to the six prompts, but you would agree that the ALJ would look at prompt number six, which is the primary use of the property for charitable purposes. Absolutely. And the ALJ found that only one percent of their revenues actually went to charitable purposes. So if you were only to look at prompt number six, the ALJ found that you didn't qualify. There were two errors with the way the ALJ applied prompt number six. So let's deal with my question first before you go into the two reasons. Do you agree that if the ALJ were to apply only prompt number six, the ALJ found that only one percent of the revenue was used for charitable purposes and, therefore, you didn't qualify? And as you know, the standard review here, do you know what it was, the standard review? It was the standard review that he conveyed in the error law on applying all the factors. So we think de novo. We also think when we go to de novo, it's issues of law which he got wrong, Your Honor. But it's probably clearly erroneous. Well, try clearly erroneous, Your Honor. Here's a problem with clearly erroneous in this case. You've got a stipulation that says you satisfied all the causing factors. This entity satisfied all the causing factors. And you have a decision that says, by the way, I think you only satisfied number two. You're not being told which one it is to defer to. They're made by the same agency. So if you're supposed to defer to the expertise of the agency, they're both equally expert decisions, and they're inconsistent with each other. So that tells me that there's something seriously went wrong below, which is one of the senses you're supposed to have when you apply the clearly erroneous test. Because the Department of Revenue, the agency that made the decision, is an agency that stipulated that that entity that owned both buildings was a charitable organization, meaning that its purpose was charitable, meaning that it satisfied all the criteria, and meaning, to your question on the 1%, that it satisfied that. Why did he make a mistake on that? It's because it's not 1%. All he looked at was the hospice building when he should have been looking at the entire entity. If you look at the entire entity, there were other benefits that were taken into consideration, which did not relate to Medicare paid for services. For example, I think in the record at page 393, 394, there's a listing of over 30 Chicago schools where grief counselors go to in all the counties. Lake County, Cook County, Page, name them, where grief counselors have gone from our organization to help teachers, to help students deal with tragic death events, death of a teacher, gun shootings, overdoses, death of a family member. None of those things were Medicaid. He was only looking to patients. And so when the department entered that stipulation, it was looking at the entire mission of the Midwest Palliative Care Center, and he took only the hospice. And in fact, the financials are not separate. There were no financials just for the hospice. If he had looked at everything, he would have seen that the figure is actually 1.6 million in unfunded care, which is out of 4 million in community benefit. So the error we see as a matter of law... What is unfunded care? Unfunded care with patients means that portion of care that is not covered by Medicaid. It also means other services provided to the patients that Medicaid would never cover. So there's additional therapies we provide that Medicaid would not pay for, so it wouldn't even be billed to Medicare, and we provide those. You provide those to insured and uninsured Medicare and Medicaid patients. Right. The testimony of all the witnesses was that once a patient is admitted, it doesn't matter whether they're being paid. I understand that. So what's the rest of your unfunded care? These are services that you don't get paid for, correct? Correct. So there are a number of... We have counseling, crisis, and intervention, which is provided for, which is part of that I mentioned going to the schools and community. We have... Counseling. I'm trying to figure out how you come up with this million-dollar-plus number. So they have counseling. If you pay the counselor $50,000 a year, right, and that counselor happened to go out to a neighborhood school to do trauma intervention, you would write that $50,000 into the unfunded charitable work you do? There is a portion of that that would be applied to that. Okay. What else? There is support for low-income patients provided at home and in the hospice center, so we provide that care to them. So if you sent a hospice worker to a home and the charge was $1,000, say, and Medicare, Medicaid, or private insurance would only pay $500 for that service, you would say that the additional $500 charge was part of your charitable work? It is covered by donations, yes. We do apply donations. Covered by what? Donations. Our charitable fundraising covers what we don't get paid for by Medicare. And your charitable fundraising amounts to how much? Well, it was over $1.9 million in that year. It was $13 million in order to build the pavilion, to build the hospice. It was a charitable drive that took $7 million to build it, as well as some grants. But in that year, $1.9 million were from donations. I lose you. $1.8 million in charitable fundraising for 2013? Correct. We had 400,000 in grants in 2013. And then in 2012 and 2013, which is the year that that building opened, that building was built as a result of a $13 million fundraising drive from donors who had gone through hospice experiences and decided they needed something better, they wanted something better in the community. I'm sorry. Go ahead. No, go ahead. I'm changing it a little bit. I just want to go back to just as Piers was questioning, because I wanted to just get done with the unfunded care. You've given us two examples of unfunded care, and that doesn't get you anywhere near the million dollars. I'm just trying to see how you get there. We also have the fellowship program with Northwestern Memorial Hospital. So on rotation, there were three doctors in 2012, two doctors in 2013, that come through and are trained at the hospice on dealing with palliative care medicine. Palliative care is a new medical discipline. We are one of the certified providers for that. And so we train doctors, and they go out and practice in other hospitals and other hospices. But they're receiving that training there. That is not paid for by Medicare. That is paid for by charitable donations. The counseling crisis intervention I mentioned to you is not just for patients. It is for the community. There's testimony that even walking people from the community can get counseling. That gets to my question. Because we have the care center, and then we have the pavilion, or as you call it, the hospice center. Correct. So somebody comes in for intervention. Is that what you just call it? Somebody goes out to a school and talks. How is that tied into the hospice center as opposed to the care center? So the care center, the name of the center pretty much says it all. It is where the coordination of care is done for all the patients throughout the Chicagoland area. It is where volunteers are trained. And Medicare does require volunteer support, as we do by Medicare. But it's where volunteers are trained. It is where social workers are. It's where the grief counselors are. It's where people can walk in and get grief counseling. They don't even have to have a patient with us. Right, but it's where you get 91 percent exemption too. Correct. But those same disciplines, all those things that are provided by the care center, are being provided to a patient in the community. And if that patient happens to at some point require hospice, those same benefits, those same services fall into the hospice. One of the things that we think the LHA did not grasp, and it's in the testimony of Mr. Murray, is that a patient is admitted into palliative care. That's palliative care at home, in the hospital, in a long-term care facility, or in the hospice. They come in and out. There may be critical times during their illness where they have to come into hospice because it requires more medical attention. They go back out home again. This is all part of four levels of care that a patient receives as part of palliative care. So the hospice is as integral to that as the initial care center interview with the family saying, what is it this patient wants? Maybe this patient needs to continue to work, but doesn't want to have medicine that's going to cloud their judgment. Maybe this family wants them to be at home, but has children at home at a certain age that need them, or there is a religious reason why they can't die at home. Palliative care means that you drive the care to what the patient needs and what the patient wants, all the time providing medical attention. It's not going to cure them. Well, I think we all understand what that is. The difficulty is that you have 30 to $32 million in revenues, right, that are not generated by charitable contributions. They're not even close to being primarily generated by charitable contributions. It seems to me that if the funds aren't generated through charitable sources, the expenditure of those funds are not expenditures of charity. They're expenditures of your general revenue that is generated through Medicare, Medicaid, and private insurance and personal payments. What's the charity? The good works are not charity in themselves. It's great that we have palliative care centers. It's great that we have hospice, but that doesn't mean it's charitable. So there were two developments taking place as this hearing was going on. It was the case of Parmena going up. It was a case of the General Assembly looking at the way hospitals are exempted. Two key things came out of that. In this decision, the ALJ spent two paragraphs out of a 30-page decision, two paragraphs on exclusive use, and he focused only on the financials. The Parmena dissent, and Parmena is a plurality decision, so it's not president. It is not. The dissent expressly says that it is not president because only three justices read the majority opinion, two did not participate, and two are dissenting. So it's a plurality decision. The General Assembly said that in its findings for Section 1586 for hospitals. Are you suggesting that the three of us have the authority to just ignore Parmena because it's not presidential? It is not presidential. And you would not be ignoring Parmena because I think there's two things. Parmena, so let me show you how the ALJ used Parmena. There's a section of the decision where the ALJ says that it is the sine qua non of charitable care that you lift the burden of the taxing bodies, and he says, he uses that phrase, he doesn't put it in quotes. That should have been in quotes because it came right out of Parmena. When you look at that paragraph, there's not a single citation to law in that paragraph. There's citations above it to cases that say that you can provide for the general welfare, they can lift the burden of government. Nothing says the burden of the taxing districts. You're saying that a statement from our Illinois Supreme Court that is not, has a citation after it, is not worthy of follow-up? No. The dissent took that statement, and the dissent said that the majority was trying to convert that into a litmus test, converting it into a requirement of exemption. When the General Assembly looked at that, it cited the Parmena case as something that was indicative of focusing on a quantitative test that was rejected. And in the Oswald case, when they looked at 1586, they said, well, you can have a quantitative test, like for the hospitals where your community care exceeds the taxes you paid, but you still have to have evidence of actual use of the property. And so going back to 1907 with the Sisters of St. Francis case, the courts have consistently rejected a purely quantitative analysis. It is qualitative. And in those two paragraphs that the A.L. just cited for... Well, what's your qualitative evidence? Exclusive or primarily charitable use. What's your qualitative or quantitative evidence of it? I don't think it can just be the fact that you provide hospitals care. What's the charity part of that? The charity part of that, well, so we'll go back to one of the main points running through the Department of Justice is they say, well, that's Medicaid. You're being paid for that. The General Assembly, in passing 1586, made a point of saying, accepting Medicaid at a discount is relieving a burden on government for two reasons. If you accept Medicaid, you're increasing the subsidization of the government that reaches the federal government. And two, consider what happens if you don't. If you don't accept Medicaid, so now the government has an obligation to provide somewhere where these people can get medical treatment. So accepting Medicaid is relieving a burden on government. But, however, the department had already determined that what provided palliative care throughout the community and all the other services were charitable activity. The hospice was an indivisible part of that. So you're saying that any entity, any enterprise that provides hospice care is a charitable endeavor? No. Any entity that provides hospice care meets all the five criteria, of course, and for charitable ownership and shows actual use of the property. Now, if I go back to Sisters of St. Francis in 1907, Sisters of St. Francis had 6% charity patients. Six percent. That's no different than Provena. That's no different than us. That is maybe less. So, you know, since 1907, there has been a rejection of qualitative standards. And just because you pay for something, does not mean that you're inconsistent for that in charity. In fact, you have to generate revenue in order to have something to give. No doubt. And how is that revenue generated? Through charity? Well, partly through charity. Partly. Partly what? Less than 1%? No, Judge. I mean, $13 million to build a home is. No, no, no. $13 million went to construction. What did they generate in 2013? In 2013, there were $1.9 million in charitable gifts. Which is of what percentage of their total revenue? Less than a half. Of total revenue. But that is done every single year, Your Honor. Every single year, they raise donations in order to be able to provide that care. I understand that, but the point is it's de minimis. It's less than a half a percent of their total revenues. That's only if you look at the hospice, Your Honor. Only if you look at the hospice. The evidence was that they had $30 to $32 million, roughly, of revenues for 2013, correct? Correct. And $1.9 million in charitable contributions. That wasn't just limited to hospice, was it? Or was that for the entire operation? That $1.9 is to the entire operation. Because it's only $157,000 as it relates to the hospice center. And the revenue was $13.6 million. Correct. Okay. So, again, it's less than 1%. Well, one of the arguments we've had, and we haven't had to, you know, we've said from the beginning, and it's because all these cases were pending, we've said that if you're going to allow a hospital to be exempt without having to prove use, and the hospital court then decided you have to prove use anyway. If we submitted into evidence that if we had used the same standard, our taxes of $335,000 would have been exceeded in terms of community benefit measured by hospitals by $122,000. If we had a hospital license as opposed to a hospice license, we would have satisfied all the criteria of 1586. So how do two charities, under the same constitutional provision, for a charitable exemption, it's good for one but not for the other? Well, but that happens all the time. There are two parallel cases. One of the cases, both of them a car accident. Two people sitting in the back seat of a car. One person settles. The other person doesn't. And the person who didn't settle loses. He gets nothing. It's a nutshell. It's really, I know that's really simplistic, but that happens all the time. In this case, the government settled with you on part of the building. And on the other part, they didn't. So, and that's what we have here. But here's the real problem. The ALJ found that the primary purpose was to provide hospice care to those who can afford to pay for it or have insurance or have government assistance. That that's the primary purpose for your providing hospice care. And you could say the same thing in North Carolina about such a thing. So now the question for us becomes whether or not the ALJ's decision is clearly wrong. This comes before us as an administrative decision, which normally this court gives great deference to decisions of administrative agencies. And the standard is whether or not the decision is clearly wrong. You have the five course and test applied in a completely inconsistent manner. The two buildings are ruled by all the same organic, you know, the legal DNA is the same. You're basically telling them that one of their twins is illegitimate. Applying the test the same way, they would both be legitimate. So that, to me, indicates a misapplication of the test by the ALJ. Secondly, he made a decision on news. Well, if the department already determined the care center is exempt and that's where you go with your family to find out if your patient should be taken care of, that parking space where you parked was reasonably necessary to having that consultation. And somehow providing a deathbed for that family member is not reasonably necessary to that same mission. That shocks me in terms of the mission that's carried out in that parking space and in that bed are the same. And so that is one of the tests for clearly wrong. It does shock me in that regard. Mr. Wynn, we've taken up most of your time. If you have something else you'd like to highlight, not spend a lot of time, then I'll let you finish. Yes. In the two paragraphs that he cited as exclusive use, he cited, you asked about qualitative, he cited the American Legion Post-108 for the proposition that we didn't give enough charity. If you actually look at that case, what the court said there was, yeah, there was no charity given because what the American Legion does is not charitable. You're not the American Legion. We're not the American Legion. And the department already determined what we do is charitable. Thank you. Thank you. And by the way, the American Legion is not an exempt entity under the Illinois Constitution. Good morning, Your Honors. May it please the Court. Illinois Assistant Attorney General Carl Elitz for the Department of Revenue. Good morning, Counsel. Your Honor, as the Court understands, the issue is whether the hospice care center or the hospice portion, what I'll call the pavilion, was exempt in 2013. The department agreed with stipulation that the center would be exempt in 2013. The Court shouldn't take anything from that except for the fact that the center is exempt in 2013. We proceeded on the hospice portion or the pavilion portion of the property. It was a new facility. They were doing something different than they had done before. And the question for the taxpayer was whether they were using the property exclusively for charitable purposes. We've conceded that they're owned by an institution that is capable of providing charitable services. They do that, in fact, in the center portion of their property. But with regard to the pavilion portion, they have a high burden. They have to show with clear evidence that the property is being used exclusively for charitable purposes. Now, the courts have used historic... It doesn't have to be exclusive. The word exclusive in the Constitution has been defined by the Illinois Supreme Court as primarily used for charitable purposes, which no one is quite sure what that means, but not de minimis, as some of the cases have said. The test... Provena provided for circumstances that said those circumstances are primarily used for charitable purposes. Let me address Provena, if I may, Your Honor. Provena was a 3-2 decision in the Supreme Court. That's not precedential. But the appellate court decision in Provena was, I think it was 3-0 in the 4th District, and it addressed the same issues, and it addressed them in a way that I think is completely correct. The Supreme Court didn't reverse Provena, the appellate court decision. So when you look at Provena, and don't just look at the Supreme Court's decision, it affirmed the appellate court's decision on other grounds, not on exclusive use. So it has limited assistance for the court in plumbing what it means for exclusive charitable use. But the appellate court's decision is there, and it's a fine example of the analysis that the Department has been using for a very long time. And that analysis draws on that case Methodist Old People's Homes v. Corzine for exclusive charitable use. Mr. Wynn insists that the Corzine factors don't apply to use, that they apply only to the ownership question. But that's not what the Illinois Supreme Court has said. It's not what the Illinois Supreme Court said in Corzine. It's not what the Supreme Court said in Northland, which came shortly after Corzine. There's a case called Eaton that applies Corzine to charitable use. Let's talk about Corzine for just a second, the six factors. The first factor, the organization is set up for the benefit of an indeterminate number of persons. How doesn't this qualify? The NLJ looked at the way they were using the center and determined that it was set up not for an indeterminate number of persons, but persons who had private insurance or could draw on Medicaid or Medicare. That is what the evidence showed was the primary use of the facility in 2013. Eighty-eight percent were from Medicare or Medicaid. Well, allow me to step back a minute for your honor. The record in this case commingles the financial information relative to the center and the pavilion. So a lot of the numbers we have are not broken out with regard to what goes on at the new pavilion. But we know that the new pavilion has 16 beds for hospice patients. The NLJ found that 37 people were treated for hospice care in 2013. I'm assuming those 37 people were mostly treated in the new building. And those people, I don't think Mr. Wynn would disagree with me, in general had Medicare, Medicaid, or private insurance. The total organization drew 88 percent of its funding in 2013 from government insurance and additional amounts from private insurance. But it says it's set up for the benefit of, and I know that not the bylaws, but some of the other, the manual, say that they don't take into account whether they can pay. They don't take into account whether the person can pay when delivering services. So they're not discriminating against anybody that's in the facility and has been accepted as a patient. But in practice, we can see from the numbers that they are not taking people who are in need of charity. They're taking people who can afford to pay for their own health care. There was an exception. There was one person, they produced a letter that showed that they had waived 93 percent of a bill. I think I have to acknowledge that someone who's got 93 percent of his bill waived is likely receiving a charitable service. But one patient the whole year. But isn't there a minimal number of people who would not qualify for Medicaid or Medicare for this hospice? I mean, I understand, aren't most people going to hospice 65 or older? Most people would qualify. Their witness, Mr. Murray, testified that there were, however, people who don't qualify. Those are people who are not documented, and so they can't access Medicare and Medicaid. They may not have private insurance. Those are people who are perhaps homeless and haven't made the applications. He also, I mean, he was their witness. And he testified that it can take up to six months to get these government benefits. Well, six months is the maximum amount of time that you can use a hospice service. But when we're dealing with this first issue, and the defense against it is that it's not indeterminate. They're servicing people who have governmental assistance or insurance. And almost everybody has governmental assistance and insurance. Doesn't that kind of qualify under that one? Wouldn't it be clearly erroneous to say that it doesn't? No, because the second part of that test also looks to whether it reduces the burden of government. And it's very odd to say that accepting the maximum amount that Medicaid and Medicare will pay reduces the burden of government. It seems that the government is funding most of the activities at the hospital pavilion, at the hospice pavilion. I think one could say, well, a lot of the Medicare and Medicaid doesn't really cover their cost of services, and so that's a charitable. That's a judgment call that the ALJ was entitled to make. The ALJ looked at this factor and said this was not relieving the burden of government. This is actually drawing on government benefits. And then number four, the ALJ said that he felt they were placing obstacles. Because what, they weren't promoting it enough that they would? Forgive me, Your Honor. Sometimes the course of factors, the numbers get mixed up. Charity dispensed to all those who needed to apply for it? Yes. The ALJ looked at the brochures that the facility had generated and read them and then said, these don't really signal to someone who is reading them that they could come to the hospice center and receive charitable care. Now, the circuit court judge, in reviewing the same material, said he felt that that wasn't the proper way to review those brochures. But that's classic deference to the ALJ who heard the testimony and saw the record and who also heard testimony that, and I'm not sure whether it's 400 or 800, there seems to be some disagreement in the record, but there were hundreds of people who made requests to the facility as to what it would take to use the services there. They said 400 people at least came, reviewed the facility, and then decided not to come on service. And from that, the ALJ said, well, why would these people, who were obviously interested in caring for someone who was dying, not come on service? And he said, he made the inference that it's because no one said, we'll take you anyway. Don't worry about it. And, in fact, they don't say, we'll take you anyway. Don't worry about it. What they say is, you're unfunded. We'll work with you. But that doesn't necessarily, as Justice Pierce's questions I think got to, that's not necessarily charity. That's what a for-profit hospital would do. But didn't they get into the geographic nature in that they didn't get a bunch of people from the south side? And the facility's located in Glenview. Who's going to have someone who's terminally ill and be visiting them when you might need public transportation? Doesn't that seem a bit clearly erroneous? No, Your Honor. It was their witness who was asked, what is your service area? And he said, from the Wisconsin border to the south. Oh, no question that's in the record. But the ALJ said, didn't get anybody from down there. It's entirely possible for this charitable organization to reach out to the communities it serves and says, we'll work with you to deliver the charity that is our exclusive or primary purpose. It's odd that an organization that says its primary purpose is to dispense charity doesn't have the outreach to bring people who need the services in. Instead, what happens is they take referrals who then present, and then they say, well, let's figure out whether you have insurance, and they work with them. If they don't have insurance, they're designated unfunded. They're not even calling the people that they're saying they're dispensing charity to. They're not providing charity. They're not saying it's charity. It's very hard for the department to find that an organization that's dispensing service on a property exclusively for charitable purposes when they won't even identify that that's what they're doing. And they're not doing that. And their bylaws don't say that. There's nothing in the bylaws about waiving fees. The ALJ pointed out there's nothing in their budgeting for charitable care. Their response to that was, well, we'll just do as much as needed. But, just as Walker had pointed out, the numbers are really quite minimal here. And I think the word was used in minimus. I think this is a perfect example of that. $157,000 in 2013 in a revenue stream of $30 million. That just doesn't seem like your primary purpose is charitable, and the ALJ certainly didn't commit clear error in making that finding on these facts. I want to emphasize that I think the thrust of Mr. Wynn's brief is that CORSEN doesn't apply. We don't have to meet the CORSEN standards. That's not what the cases say. They do need to meet the CORSEN standards. The ALJ thought that that's where this hearing was going. At the end of the hearing, they announced we don't have to meet the CORSEN standards. It's the same operation as the center, so therefore we don't have to do it. There's a couple cases he has that talk about ancillary activities, cases involving parking lots, cases involving daycare centers. There's one where a hospital was allowed to knock down gang-infested buildings, and the Department of Revenue granted an exemption for that because it was shown that it was tied to them operating the hospital successfully. Here, everyone began the hearing with an understanding that what's going on at the center is different than what had been going on. I'm sorry, what's going on at the pavilion is different than the pre-existing operations that were going on at the center. And regardless, the fact that the department decided to settle for half of the case doesn't really inform what the proper analysis in the second part of the case that the department did not settle should be. Mr. Wynn drew an analogy with what I call Sisters of the Third Order, a 1907 case. That's a terrific case explaining what it is that charitable care involves. In that case, the nuns that were in the hospital had a relatively small percentage of the total population of the hospital was receiving for free care. But the case makes clear that the hospital itself was being run by people who had taken a vow of poverty and were not drawing any salary or bonuses or any of that sort of remuneration. In this case, as the ALJ pointed out, there was no evidence put in the record at all about what the managers for the pavilion property were drawing as far as salary. And I'm almost certain to say that it wasn't like it was in Sisters of the Third Order where the nuns were running the hospital as a charitable institution. Mr. Wynn said that the test should not be a purely quantitative analysis and has spelt it out brief for suggesting that there should be broad rules governing his care. It's exactly the opposite. We're not saying it should be a purely quantitative analysis. The ALJ looked at the numbers as part of the total analysis. The long decision that you have in the appendix to the appellant's brief shows that the ALJ went through all the factors, talked about all the factual determinations that came from the hearing, and applied the law. And it's our contention that that application of law effects was not clearly erroneous. Mr. Wynn suggests that shouldn't be the standard. I gave the court an abundance of cases, and I was careful to make sure they were all tax cases, where the appellate court and the Supreme Court had said the standard of review is clearly erroneous. So I don't think his argument has legs with regard to arguing for a de novo review. With regard to Section 1586, the new statute that governs hospital care, that has worked its way to the Illinois Supreme Court in the Carl case. It was sent back. There's been another case that worked its way to the Supreme Court, Oswald. Those cases, I think, now establish pretty clearly that simply meeting the statutory test in 1586, if you're a hospital, won't get you the exemption. You still are required to meet the constitutional standard for exclusive charitable use. And, again, I would represent to the court that that is the coercion test. That is the six factors. Those are considerations, by the way. They aren't tests. It won't prevent someone from getting an exemption by not making one or two of the coercion factors. But the coercion factors inform the analysis. And the analysis isn't with regard to the total operation of the owner. The analysis is with regard to the particular property at issue. And the decision in Provena says that clearly. If I can quote briefly, property which is used to produce income is not sufficient to establish charitable use because generating income to then use the income in other places is not use of the property. And that's kind of what he's talking about when he says that the community benefits that are provided here are approaching a million dollars. Healthcare delivered in someone's home is not use of the pavilion property. They need to make a showing to the ALJ that the pavilion property is used exclusively for charitable use. And you mentioned this earlier, but the reasonably necessary, you said they waived it at the hearing. But what's your response to that? Thank you for raising that, Your Honor. That was the last point I didn't want to forget. So after they sort of say, well, even if we can't meet the cause and factors, we should meet the test because it's reasonably necessary for us to advance our mission. And then they cite these cases, and I think there's three in their appellate court decisions. It's the parking lot case. It's the daycare case. It's their vacant land case. Those are ancillary to the functions of the main that the taxpayer is engaging in. The taxpayer isn't a parking garage company. The taxpayer isn't a daycare company. The taxpayer is saying we have this small piece of our property, and they're asking for that to be exempt as well. And in those cases, they've been able to convince courts not to apply the cause and factors and to just say, well, that's it. But in no case has any court ever said that a stand-alone building is exclusively charitable because it's part of an organization that does this in other places. But wouldn't there be certain circumstances, I think Mr. Wynn mentioned, where it would be reasonably necessary for the person to come on site and stay there because it wouldn't and so that would be the reasonably necessary part as opposed to their own home for whatever reasons. He gave a bunch of them. And I'm not even suggesting that that couldn't be charitable. I'm just saying that there's not any evidence in this record that that happened. We have one witness who talked about one waiver at 93%. I'm not even sure if that happened at the New Pavilion facility. But assuming it did, that would be one of 37 people. Well, but those reasonably necessary cases, I mean, they charged for parking. They charged the employees for use of the daycare center. So those weren't charitable. I took it that they were reasonably necessary to the primary use of the accepted charitable organization. In that, I'm remembering the First Sister case involving the parking lot where the court said that employees were charged $42 to park their vehicles. The court was very careful to say two things, that it was essential in the city of Chicago for the hospital to have a parking lot. There's been no finding that this organization can't run its primary purpose without the pavilion. In fact, it went for years without the pavilion. That's the first response. The second is the court was careful to say all the money generated from the parking garage was used for the parking garage. Mr. Wynn just explained that money being generated at the pavilion may be used in the community to provide services to children, to do grief counseling. That's not got anything to do with the exclusive use of the property. We've got to tie it back. And not only that, it not only has to be tied back to the property, it has to be tied back to the property in the tax year. That's the kind of evidence that's required. That's the evidence that I'm assuming they produced in 2008 when the department gave them an exemption for that property. The LHA made the point that the evidence here was just not the type of evidence that we would see in an exemption case. It didn't go to the exclusive use of the property. It went to the type of organization that this organization is. And I want to emphasize the point. No one is saying that health care providers aren't good people doing good work and are deserving a great deal of gratitude. But the question is whether they're providing exclusively charitable services or primary charitable services on the property. And in this case, the evidence is not showing that. It's certainly not clearly erroneous. Let's respond quickly, though. Mr. Nguyen's argument is that the only issue is the charitable use. He's right. Because if we jump to the stipulation, charitable ownership is not an issue. I agree. And then I also say, and he disagrees, that Korsen is the test for charitable use. Okay? That's really a major disagreement that he and I have. And I say it in my brief, and I'll tell you it's Korsen, Nordman, Eden, and Oswald are just the Supreme Court cases that have talked about use and the Korsen factors. There's other appellate court decisions as well. And that's why the ALJ said, what are the factors? Let's find them. Now, they don't all go directly to use. The second one is whether you pay dividends or not. That's really got nothing to do with the property. But we know from experience that if a facility can make the Korsen factors, it's more likely to be using its property for the exclusive charitable use. So it's by inference, except for that last factor, which seems to be the whole test, whether you're using the property primarily for use. The hospital industry has fought very hard on that. That was an issue in Carl. It was an issue in Oswald. It's going to be an issue when Carl comes back up. And I see the same arguments coming from Mr. Nguyen. But as of today, the Supreme Court has been clear about this. Korsen is the test for exclusive charitable use. And I urge the Court not to stand unaware of the precedent that we have, which is substantial. Let me just ask one quick thing, sorry. Just at the end of the day, we have the same entity, the same land, the same charitable work, if it is or isn't, same patient population, same intake and financial procedures. And part of it is considered exempt and part of it isn't. Just help me with that. Your Honor, if you need to affirm and you feel uncomfortable about that, you can certainly take solace in the idea that the taxpayer has the benefit of creating a clear record and that in the absence of clarity about how this property is used, you can't reverse the Department or shouldn't reverse the Department's decision. And so at the very least, this record, which does not contain information about how the pavilion was used with regard to how the money was flown from those patients and how money was spent with regard to those patients, you can't say that the ALJ's decision was error. That's the course that the Circuit Court took. I would suggest that the Department of Revenue's decision is correct. But it certainly shouldn't be reversed. Thanks. I think your time is up. Your Honor, thank you. I would ask that the Court affirm the Circuit Court, affirm the Department's decision. Thank you. Thank you, Your Honor. I want to put something in context. In the year before the pavilion, before the hospice was built, if we look on the record at page 368, the financials show that before the hospice was built, the operating revenue was $26,403,000. That's what was exempted by the Department in a stipulation by settlement. When the hospice was built, the additional revenue that we're talking about is about $2 million. Now, you mentioned, you know, the more... I'll go with your numbers back. Illinois law limits a hospice to 16 beds. You don't know why. That's just what it is. So there is a limit, physical limit by law, on how much we can give. But if you look at the number of hospice patients that were provided charitable care, it was actually 28 percent of our capacity, if you look at the actual patient number. So it was not the 1 percent. It was 28 percent of that. Two, we haven't said at any time that coarsen does not apply. We have said coarsen applies absolutely. The problem is he used tests for ownership, and I'll show you how that can happen. You can apply all... We don't have enough time to tell us that. I'm sorry? We don't have enough time for you to show us that. But let's just use your time to revolve. No. Because we're way over time. We do understand coarsen, so... Well, then you can apply the five tests without ever seeing the property, and if you fail any one of them, you know the property is not going to be charitably used. So you don't have to look at the property for that. Strictly, even though it's still being litigated, it is relevant because if Medicaid is acceptable to lift the burden of government for hospitals, it is acceptable to lift the burden of government for us when we accept it as well. As far as the clarity of the record and the use, in our reply brief we told the true story, similar record, of a woman who received child care at home and at some point had to come into the hospice. What that means is that the care provided in the field was exempt, and the minute she got too ill to be treated in the field and she came to the hospice, it's not exempt. It's the same patient, same needs, same mission, and for some reason, because we crossed the door of a different building, it's not exempt. That's not consistent. That's not consistent application. As far as the clarity of the record, and I'll keep this brief because I know I used a lot of your time, none of the cases on reasonably necessary use of the property to an exempt purpose, if you look at those cases, none of those cases did the court say, well, I know you came in with an exempt hospital and now you want an exemption for the daycare. It didn't start reexamining the exemption for the hospital. Well, this case started that same way. Here's a stipulation that says this care center's exempt. It's got charitable ownership, charitable use. There was no need to go and reexamine everything. He could reexamine it, and if he had a problem with that, he should have said so. He makes a recommendation, not a decision. He should have said, I have a problem with the stipulation. I don't think I agree with that. He didn't. So what you have before you is an agency that wants you to give deference to two inconsistent decisions, and that cannot be sustained under the clear error test. As far as the articles of incorporation, you mentioned the bylaws. There's a rarity here, but the articles of incorporation that are on the Secretary of State's office are the ones that say that Midwest will take any patient without regard to ability to pay and that it will not delay the decision to provide care while he makes that decision. So it's in the articles of incorporation. Well, if the articles of incorporation for Rush Hospital had that provision, would you say that Rush Hospital should be exempt as a charitable institution? You would have to prove that, and the proof isn't. There is no evidence. Well, you could have listed it. You could not prove it, Mr. Wynn. Well, Northwestern Hospital, University of Chicago, none of them are charitable institutions. They're not used for charitable purposes. They do wonderful work, great work. They're hospitals. They do lessen the burden on government. They're hospitals, but they're not charities. That's the question. Well, we cited the clear error case in the requirement. The clear error case says that if you lessen pain or suffering, if you lift the burdens of government, that is a charitable beneficent endeavor. A methadone center lessens the burden on government, but they're not charities. You can do charitable acts without being a charity. So the issue is did your client prove at the administrative hearing that it was a charitable use of the property in total, not individual acts? So we came in with the fact that that agency had determined we were a charitable organization, making a charitable use by providing palliative care. And I mentioned the same patient that came in. They're providing the same care in that building as they arrange in the other building. So we're making that use. If you want to look at charitable exemptions, Ravinia is exempt. Museums are exempt. Ravinia is not exempt as a charity, is it? It is. Is it? It is. Okay. I don't know their background. Well, the same test is applied. You lessen the burden of government, you improve the general welfare. There is no requirement that it be the particular taxing district, or there's no requirement that you not be engaged in an activity that raises revenue because that's what provides the basis for you to be able to dispense charity. Is it helpful? Simply, we believe it is. It does shock. You can't have deference to two inconsistent decisions, and we would ask you to reverse the department's decision. Very well. All right. The court would like to thank the parties for their efforts in this regard. We'll take the matter under advisement. Please call the next.